UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| AMANDA MONAGHAN, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | 1:13-cv-00395-JCN |
| JOSEPH FITZPATRICK, | ) ) ) | |
| Defendant | ) ) | |

**MEMORANDUM OF DECISION**[1]

In this action, Plaintiff Amanda Monaghan challenges the constitutionality of a prison policy maintained by the Maine Department of Corrections, which policy permits the Department to bar all communication, including correspondence, between an inmate and the inmate's former domestic partner, if the Department concludes that it is appropriate based on certain criteria administered by its Director of Victim Services, subject to review by the Department's Commissioner.

The matter is before the Court on cross-motions for summary judgment. (Plaintiff's Motion for Summary Judgment, ECF No. 34; Defendant's Motion for Summary Judgment, ECF No. 44.) As explained below, after consideration of the parties' factual statements and their arguments, the Court denies both motions.

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge John C. Nivison conduct all proceedings in this case, including trial, and to order entry of judgment. Specifically, the parties consented to Magistrate Judge Margaret Kravchuk and her successor. (Consent to Jurisdiction, ECF No. 13.)

## BACKGROUND

Plaintiff filed suit on October 24, 2013. The operative pleading is Plaintiff's Second Amended Complaint, filed February 6, 2014 (ECF No. 19). The parties have entered the following stipulation:

> This case is a matter of great public interest. The alleged injuries in this case are capable of repetition, yet may consistently evade court review because the terms of many prison sentences are often shorter than the timeframes of federal court litigation (including appeals). The State waives any defenses related to mootness.

(Stipulation, ECF No. 16.)

### The No-Contact Policy[2]

Under ordinary circumstances, prisoners in the custody of the Maine Department of Corrections are permitted visits from family and friends. (Pl.'s Statement of Material Facts (PSMF) ¶ 161, ECF No. 35.) Department staff members supervise visits with prisoners. (*Id.* ¶ 163.) Prisoner attacks on visitors are uncommon. (*Id.* ¶ 165.)

On May 20, 2013, the Maine Department of Corrections adopted revised policies on prison visits and communications. In particular, the Department implemented as policy the directive that "a prisoner who is convicted of *or otherwise known to have committed a domestic violence offense against a person*" shall not be allowed to have contact with the victim through mail, telephone, or visits "without prior approval of the Commissioner, or designee." This policy is referred to hereafter as the "No-Contact Policy" or "the Policy." (*Id.* ¶ 1.)

---

[2] The Court's factual statement is derived from the parties' Local Rule 56 filings. In most instances where the Department has offered a statement purporting to articulate the reasons the Policy was implemented, and the concerns it is meant to address, Plaintiff responded with an objection that the statement is conclusory, speculative, illogical, or argumentative; Plaintiff thus denied the statement. An evidentiary objection, however, is not a valid basis for denying a factual assertion. Statements not properly controverted are deemed admitted when supported by record citation. D. Me. Loc. R. 56(f). Although the Court does not repeat herein numerous statements offered by the parties about domestic violence and the characteristics of those who are the perpetrators and victims of domestic violence, the Court recognizes that the serious, challenging problem of domestic violence is a central issue in the case.

The No-Contact Policy was established at the discretion of the Department. (*Id.* ¶ 7.) When applied, the Policy prevents all contact, including contact by mail and telephone, between a prisoner and an alleged victim of domestic violence. (*Id.* ¶ 8.) Prisoners and their former domestic partners may request a waiver of the Policy. (*Id.* ¶ 51.) From the inception of the Policy, the Department has denied most waiver requests.[3] (*Id.* ¶ 9.) Where the Department has granted a full or partial waiver, both the inmate and the victim requested the waiver. (DSMF ¶ 76.) Prior to the adoption of the No-Contact Policy, the Department would attempt to block calls and mail if a victim requested no contact, if a court order prohibited contact. (*Id.* ¶¶ 128-129.) With the No-Contact Policy, the victim is not required to make the request, and the Department will prevent contact even if the victim prefers contact. (*Id.* ¶ 130; DOS ¶¶ 125, 130.)

Shortly after implementing the Policy, the Department determined that it would offer domestic violence programs to prisoners particularly in connection with the review of waiver requests, as an incentive for prisoners to participate in the programs. (DSMF ¶ 26.) Initially, the program was an eight-week program, which consisted of an introductory domestic violence program offered in some jails by certified community providers. After several months of discussions with community providers, Tessa Mosher, the Director of Victim Services, arranged for the implementation of the program at two facilities in late 2013. (DSMF ¶ 67.) In October 2013, Ms. Mosher sent an individual invitation to every prisoner who had applied for, but had not received a waiver, including Robert Hart. (*Id.* ¶ 68.) In the letters of invitation, Ms. Mosher informed the prisoners that upon completion of the program, the Department would reconsider,

---

[3] As of May of 2014, less than one-quarter of all Department prisoners identified following the implementation of the policy revision as domestic violence offenders had applied for and been denied waivers. (303 identified, 103 applied, and 75 denied.) 75 prisoners were denied waivers from all six facilities out of approximately 2000 prisoners total incarcerated with the DOC. (DSMF ¶ 58; see also DSMF ¶ 75.)

3

but not necessarily grant, a waiver request.[4] (*Id.* ¶¶ 68, 73.) The current program is a 26-week program.[5] (*Id.* ¶¶ 70, 78.) The Department considers renewed waiver requests by prisoners who have participated in 13 sessions. (*Id.* ¶ 78.)

When the Department was implementing the program, the Department's Commissioner (Joseph Ponte) received an e-mail from a unit manager within the Maine Department of Corrections (Luke Monaghan), in which e-mail the unit manager who oversees a unit with 250 prisoners expressed the following concerns about the No-Contact Policy: how to identify victims, how to know which telephone numbers to "block," how to "track" related mail, whether to "grandfather" certain inmates, and how best to address certain "ethical and operational implications." (PSMF ¶¶ 23, 71-81, 172.)

The Department does not maintain written guidelines or standards that govern the Department's consideration of a waiver request. (PSMF ¶ 10.) However, Ms. Mosher developed a set of criteria that she applies, some of which she communicates to waiver applicants. (DOS ¶ 10.)

> The primary criteria include the nature of the domestic violence and related crimes, looking at the seriousness, whether they are repeated and/or recent, and whether children were present; compliance with any court-ordered conditions of no-contact and participation in a certified batterer intervention program; the "health" of the relationship between the prisoner and the victim; compliance with the policy while awaiting the waiver decision; prisoner disciplinary and behavioral issues; participation in programming, including, if applicable, participation in a facility domestic violence program (not applicable in Hart's case at the time as these programs had not yet been instituted); length of incarceration; and content of the request letters. Other factors might be considered depending on the specifics of the individual case.

---

[4] In fact, completion of the program has not resulted in a waiver for many of the program participants. (DSMF ¶ 77.)

[5] The program is currently called the Family Violence Education Program and has been implemented in all of the Department's adult facilities. (DSMF ¶ 72.) Inmates who have been denied waivers are given priority access to the program. (*Id.* ¶ 71.)

4

(DSMF ¶ 111.)

### Robert James Hart

Plaintiff is a former domestic partner of Robert James Hart.[6] (PSMF ¶ 12.) Plaintiff is not incarcerated. (*Id.* ¶ 23.) Mr. Hart has been incarcerated at the Maine State Prison in Warren, Maine. (*Id.* ¶ 15.) Mr. Hart's incarceration is the result of an August 1, 2013, order revoking his probation and directing that he serve 18 months of a suspended sentence. (ECF No. 47-1, PageID # 717.)

Plaintiff has a child with Mr. Hart, and another child whom she considers to be Mr. Hart's step-child. (PSMF ¶¶ 13-14.) The Department refuses to permit Plaintiff to visit Mr. Hart at the prison and has denied visitation between the two from the beginning of Mr. Hart's term of incarceration. (*Id.* ¶¶ 18-19.) With the exception of a brief call at the start of Mr. Hart's incarceration, the Department has refused all communication as well, including any contact by mail or telephone. (*Id.* ¶ 20.) Although the Department asserts that another ground has arisen to justify the no-contact decision, the No-Contact Policy is an independent ground upon which the Department has denied all contact between Plaintiff and Mr. Hart. (*Id.* ¶¶ 21, 46; Def.'s Opposing Statement (DOS) ¶¶ 21, 46, ECF No. 46.)

Mr. Hart has never been convicted of any offense involving domestic violence against Plaintiff. (PSMF ¶ 41.) Mr. Hart's release from prison will not be conditioned on any restrictions regarding visitation or contact with Plaintiff. (*Id.* ¶ 42.) Mr. Hart is not incarcerated for a domestic violence conviction. (*Id.* ¶ 43.) Mr. Hart has no outstanding or pending charges against him for

---

[6] Plaintiff states that she is engaged to be married to Mr. Hart and that they are in a loving and mutually-supportive relationship. (*See*, *e.g.*, PSMF ¶¶ 12, 24.) Defendant denies such statements and supports its denials with information related to the nature of communications Plaintiff and Mr. Hart had prior to the Department's application of the No-Contact Policy to prevent any further communication. The Court concludes that the nature and quality of Plaintiff's relationship with Mr. Hart cannot be characterized as undisputed facts. Similarly, the Court concludes that it cannot characterize the desires of Plaintiff's children as undisputed facts based on Defendant's denials and qualifications.

domestic violence. (*Id.* ¶ 44.) No court order, condition of probation, or protective order currently precludes Mr. Hart from visiting or having contact with Plaintiff. (*Id.* ¶ 45.)

### The Policy As-Applied to Plaintiff and Mr. Hart

By letter dated August 19, 2013, Mr. Hart requested a waiver of the policy in order to communicate with his "fiancé, Amanda Monaghan." (PSMF ¶ 63; Aug. 19, 2013, Letter of Robert Hart to Tessa Mosher; ECF No. 35-3, PageID # 320.) In his waiver request, Mr. Hart stated that he had never been convicted of domestic crimes against Ms. Monaghan, had no domestic violence charges involving Ms. Monaghan pending, and was not subject to a court order that prohibited contact. (PSMF ¶ 64.) Mr. Hart also wrote: "I would like to inform you that Ms. Monaghan and I have a son together and he turns two next month. Amanda has fought vigorously to maintain contact with me and hopes to continue to do so. . . . I would also stress the fact that Amanda is the only person capable of bringing our children into the facility to see me." (*Id.* ¶ 65.)

On or about August 22, 2013, Plaintiff wrote to the Department and requested that she and her children be given permission to contact her fiancée, Mr. Hart. (*Id.* ¶¶ 47-48; Aug. 22, 2013, Letter of Amanda Monaghan to Tessa Mosher, ECF No. 19-1.) On August 23, 2013, the Department, through its Director of Victim Services, Tessa Mosher, denied Plaintiff's request. Ms. Mosher explained that the Department's decision was based on the fact that Mr. Hart committed a domestic violence crime against her, although he was not convicted of the offense. Ms. Mosher otherwise stated that Plaintiff's children could visit Mr. Hart in the company of another adult, provided such contact was not prohibited by court order.[7] (PSMF ¶¶ 49-50; DOS ¶ 49; Aug. 23, 2013, Letter of Tessa Mosher to Amanda Monaghan, ECF No. 19-2.) Ms. Mosher,

---

[7] The Department will allow a victim to bring a child to the facility, but another adult must accompany the child into the facility for a visit. (DSMF ¶ 90.)

therefore, sent Mr. Hart a letter denying his request for a waiver.[8] (PSMF ¶¶ 66-67; Aug. 23, 2013, Letter of Tessa Mosher to Robert Hart, ECF No. 35-4, PageID # 325.)

At approximately the same time that she wrote to Ms. Mosher, Plaintiff wrote to former Commissioner Joseph Ponte requesting contact. (PSMF ¶¶ 57-58; Aug. 22, 2013, Letter of Amanda Monaghan to Joseph Ponte, ECF No. 19-3.) Additionally, on September 30, 2013, counsel for Plaintiff wrote to counsel for the Commissioner, requesting that Plaintiff be granted a waiver under the No-Contact Policy. (PSMF ¶¶ 60-61; Sept. 30, 2013, Letter of David Soley to Diane Sleek, ECF No. 19-4.) On December 7, 2013, Mr. Hart sent a letter to Commissioner Ponte complaining of Ms. Mosher's decisions to deny contact, and reasserting his request for a waiver. (PSMF ¶ 68; Dec. 7, 2013, Letter of Robert Hart to Joseph Ponte, ECF No. 35-4, PageID # 377.) Mr. Ponte denied the request for waiver by letter dated December 11, 2013. (PSMF ¶ 69; Dec. 11, 2013, Letter of Joseph Ponte to Robert Hart, ECF No. 35-4, PageID # 358.) Following a review of the file, Commissioner Ponte also upheld Ms. Mosher's decision. (DSMF ¶ 129.) Mr. Hart declined the offer to participate in either the initial, eight-week domestic violence program, or the subsequent, 26-week program offered at the beginning of 2014. (*Id.* ¶ 135.)

In late 2013, on suspicion that Plaintiff was involved in drug trafficking within the prison, the Department began to monitor actively Mr. Hart's phone calls. (DSMF ¶ 153.) Some recorded calls involved contact with Plaintiff. The Department maintains that some of the calls reflect that Plaintiff was involved in Mr. Hart's attempt to secure drugs while in prison.[9] (*Id.* ¶¶ 154-170.)

---

[8] Ms. Mosher found that Mr. Hart engaged in one or more acts of domestic violence against Plaintiff even though he was not convicted on a charge of domestic violence, and she denied the waiver request on that basis. (PSMF ¶ 159; DSMF ¶¶ 99.) She based her decision primarily on dismissed charges in an indictment and probable cause statements offered by officers in support of probation revocation proceedings and domestic violence investigations, some of which proceedings and investigation involved another woman. (*E.g.*, DSMF ¶¶ 100, 104-105, 123.) Ms. Mosher's letter decision denying a waiver does not explain the reason for the denial. (PSMF ¶ 160.)

[9] The Department has filed a disk that contains the recordings of the call.

The Department has prohibited any visit to the Prison by Plaintiff on this independent basis. (*Id.* ¶ 171.) The Department also cites certain statements made by Plaintiff and Mr. Hart as evidence that the relationship between Plaintiff and Mr. Hart is abusive and unhealthy and that Mr. Hart has no interest in the welfare of the children. (*Id.* ¶¶ 176-182.)

### Purpose of the Policy

In the Department's view, the No-Contact Policy is designed to address the problem of domestic violence. (PSMF ¶¶ 131-133.) The Department considers preventing domestic violence to be a penological objective.[10] (DOS ¶ 132.) The Policy is also designed to protect victims. (PSMF ¶ 134.) The Department believes that the Policy, in combination with in-facility services including domestic violence counseling, helps to remediate domestic violence.[11] (DOS ¶ 137.) The primary purpose of the Policy is not prison security. (PSMF ¶ 138.) The Policy is applied to prisoners who have been convicted of domestic violence and to those who have not been so convicted.[12] (*Id.* ¶ 140.) Without a waiver, a prisoner can have no contact even for children and financial matters. (*Id.* ¶¶ 141, 146-147.)

---

[10] If this matter proceeds to trial, Mr. Ponte can be expected to testify as follows:
> There are many objectives to be achieved by a correctional system, some of them overlapping. One is to protect the security of the institutions. Another is to not let prisoners continue in the behaviors that led to their incarceration. Another is to protect the safety of the public, including the victims of crimes. Another is to rehabilitate prisoners. While these are all social objectives in the sense that they benefit society as whole, they are also penological objectives.

(DSMF ¶ 8.) Also, Ms. Mosher can be expected to testify that the Policy was an effort to obtain consistency, to assist victims in breaking free from controlling relationships, to protect children, and to help rehabilitate offenders. (*Id.* ¶ 46.)

[11] Mr. Ponte states that there is a security connection insofar as "prisoners who are domestic violence offenders [and] are able to continue their abusive and controlling behavior in the prison setting" are not engaged in "pro-social behavior" and "pro-social behavior … leads to fewer conflicts among prisoners and between prisoners." (DSMF ¶ 16.) Also, according to Ponte, victims of domestic violence sometimes are easily manipulated by their abuser and "are more likely to be involved with rules violations, [such as] the bringing of contraband into the facilities." (*Id.* ¶ 17.)

[12] Mr. Ponte states that he did not think the No-Contact Policy should be limited to cases involving domestic violence convictions because many other victims, due to the controlling nature of their partner, are not in a good position to make a contact decision and still want contact. (*Id.* ¶ 20.)

Typically, inmates do not enter into the Department's facilities unless they will be remaining for at least nine months and a day. (*Id.* ¶ 148.) The Policy imposes administrative burdens associated with identification of and management of communications involving victims. (*Id.* ¶¶ 150-151.) Defendant, however, contends that monitoring of mail, phone calls, and visits is not a practical alternative, and that during visits, guards cannot listen to each conversation given that they must supervise many visits at the same time.[13] (DSMF ¶ 18.)

Plaintiff offers expert opinion testimony from Julia Colpitts, a social worker with significant experience assessing and addressing domestic violence, in Plaintiff's effort to establish that the Policy does not effectively address the issue of domestic violence. In summary, Ms. Colpitts opines that the Policy does not serve the interests of the victim, the prisoner, the Department, or the State of Maine. She also maintains that the Policy constitutes an inappropriate blanket prohibition on communication that only makes sense in dangerous situations or where a court order prohibits contact. (*Id.* ¶¶ 84-112.)

Defendant offers the opinions of former Commissioner Ponte[14] and Ms. Mosher[15] to explain the justification for, and programmatic purpose behind, the No-Contact Policy. Commissioner Joseph Ponte enacted the No-Contact Policy. (*Id.* ¶ 119.) Ms. Mosher brought the idea to Commissioner Ponte (DSMF ¶ 42) and explained why she wanted a new policy.[16] Before

---

[13] Defendant admits it would not impose a hardship on prison guards to permit Plaintiff and Mr. Hart to write or call each other. (*Id.* ¶ 169.)

[14] Defendant offers former Commissioner Ponte as an expert witness in the area of corrections, not domestic violence. (DSMF ¶¶ 1-5.)

[15] Ms. Mosher has significant professional experience working on behalf of victims of domestic violence. (DSMF ¶¶ 32-36.)

[16] According to Ms. Mosher, one of the issues that generated the need for change within the Department was "a failure on the part of the facilities to enter probation conditions into the Department's data base." (DSMF ¶ 43.) Additionally, different facilities were approaching the issue in different ways, including where there were no probation conditions but victims or staff had requested that contact be prevented. (*Id.* ¶ 44.)

he adopted the Policy, other than meeting with Ms. Mosher and Assistant Attorney General Diane Sleek, Commissioner Ponte did not speak with anyone, or conduct any research.[17] (PSMF ¶ 120.) Ms. Mosher did not review the policy before it was implemented. (*Id.* ¶ 121.)

According to Commissioner Ponte and Ms. Mosher, the Policy is necessary to prevent prisoners who have a history of domestic violence from calling and harassing their victims, or sending abusive letters to them. The Policy is also a response to the desire of victims not to have contact, and complaints of probation officers that the Department was not enforcing no-contact terms of probation with respect to some prisoners. (*Id.* ¶¶ 114-116.) Indeed, the record reflects that in some instances, facilities have failed to enforce no-contact provisions set forth in court orders. (*Id.* ¶ 118.)

Pursuant to the Policy, Ms. Mosher has preliminary authority to determine whether a prisoner is "known" to have committed an act or acts of domestic violence. (PSMF ¶ 156.) The Commissioner reviews the decisions when they are challenged. (DOS ¶ 156.) The Policy does not provide for judicial review. (PSMF ¶ 154.) Occasionally, the Department will condition a waiver on a prisoner's participation in a domestic violence program, although participation in such a program is not a guarantee of a waiver. (*Id.* ¶ 157.) The fact that the victim wants contact with someone found to be a perpetrator of domestic violence is not controlling. According to Ms.

---

[17] Defendant states:
> Although Ponte does not remember who brought him the idea, he discussed with Tessa Mosher, as well as AAG Diane Sleek, the idea of revising the Department's mail, phone, and visit policies to prohibit contact between prisoners who are domestic violence offenders and their victims unless they were granted a waiver. He discussed it with Ms. Mosher because of her expertise in the area of victim services, and he discussed it with AAG Sleek because he wanted to be sure such a policy would be legal.
>
> ….
>
> [Ponte] saw the policy revision as a way to prevent prisoners who are domestic violence offenders from engaging in the abusive and controlling behaviors that had led to their incarceration and as a way to protect the safety of victims and others in the community.

(DSMF ¶¶ 13, 15.)

Mosher, the Policy never contemplated that she would grant a waiver request simply because a victim requested the contact. (DSMF ¶ 48.)

## CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

The parties seek a resolution to their dispute through cross-motions for summary judgment. To succeed on a motion for summary judgment, a party must establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001).

The Court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Hannon v. Beard*, 645 F.3d 45, 47-48 (1st Cir. 2011). If the Court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims. Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

### B. Plaintiff's Pleadings

Plaintiff asserts three counts in her Second Amended Complaint. In Count I, Plaintiff claims that the Policy deprives her and her children of their First Amendment right of communication. (Second Am. Compl. ¶ 39.) In Count II, Plaintiff asserts that the Policy deprives

her and her children of their First Amendment right of association. (*Id.* ¶ 43.) In Count III, Plaintiff alleges that the Policy deprives her and her children of both "substantive due process and equal protection." (*Id.* ¶ 47.) Plaintiff asserts that the Policy's restrictions lack a "valid, rational connection" to a legitimate penological interest. (*Id.* ¶¶ 38, 44, 48.)

Plaintiff requests declaratory relief, injunctive relief, damages, fees and costs. Plaintiff's pleas for declaratory and injunctive relief are directed to the application of the Policy to her and to her children. She does not request a declaration that the No-Contact Policy is facially unconstitutional, nor does she request injunctive relief beyond the particular circumstances of her own situation.[18] (*Id.* p. 7, ¶¶ 1-6.)

## C. The Parties' Cross-Motions

In support of her Motion for Summary Judgment, Plaintiff argues that the Department "has reached out to exercise jurisdiction over women and children over whom it has no lawful authority, and it is exercising this power to interfere with one of their most fundamental rights: the right to form and maintain a family." (Pl.'s Motion for Summary Judgment ("Pl.'s Motion") at 15, ECF No. 34.) Plaintiff in essence asserts that the Department cannot vitiate a non-prisoner's fundamental rights of freedom of association and freedom of communication through implementation of the Policy.

Defendant opposes Plaintiff's motion and requests an entry of summary judgment in his favor on all counts. (Def.'s Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Motion"), ECF No. 44.) In summary, Defendant contends that

---

[18] The Court makes this point to address a preliminary concern whether Plaintiff seeks to mount a facial challenge to the Department's No-Contact Policy. *See Showtime Entm't, LLC v. Town of Mendon*, 769 F.3d 61, 70 (1st Cir. 2014). Based on her Second Amended Complaint, she does not. Additionally, the Court notes that Plaintiff does not assert a procedural due process claim.

12

the Policy does not violate the First Amendment because it is prisoner-focused, is supported by a legitimate penological purpose, and, based on permissible factfinding performed by Department personnel, was reasonably applied in the particular context of the underlying waiver requests made by Plaintiff and Mr. Hart.[19]

**D.     Analysis**

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court considered whether a correspondence regulation and a marriage restriction imposed on prisoners detained by the Missouri Department of Corrections violated the prisoners' constitutional rights.  Although the correspondence regulation applied exclusively to communications among prisoners, *id.* at 92, the marriage restriction applied, in many instances, to both prisoners and non-prisoners, *id.* at 97. Because one of the regulations affected the rights of both prisoners and non-prisoners, the Court considered whether the standard of review should be drawn from *Procunier v. Martinez*, 416 U.S. 396 (1974), which the Court decided based on the rights of non-prisoners, [20] or drawn from a series of "prisoners' rights" cases, [21] all of which described a "reasonableness" standard. *Turner*, 482 U.S. at 85-89.  Rejecting a "hierarchy of standards of review," the *Turner* Court held: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89.  Following *Turner*, the Supreme

---

[19] Referring to Count III, Defendant states that Plaintiff's motion does not explain "how the policy could possibly violate" equal protection or substantive due process standards and that it is "not obvious" how it would.  (Def.'s Motion at 4.)  Plaintiff, of course, was not required to seek summary judgment on Count III.  In the absence of any developed argument by Defendant regarding Count III, it is difficult to construe his motion as a request for summary judgment on Count III.  However, the parties' respective presentations reflect that they agree that this case should be decided based on the Supreme Court precedent discussed herein.

[20] Regardless of whether *Martinez* expressed a heightened scrutiny standard, the opinion was construed by some courts as imposing such a standard whenever a prison restriction impinged upon the fundamental rights of non-prisoners. *Thornburgh v. Abbot*, 490 U.S. 401, 409-410 (1989) (citing *Turner*, 482 U.S. at 81, 87, 89).

[21] *Block v. Rutherford*, 468 U.S. 576 (1984); *Bell v. Wolfish*, 441 U.S. 520 (1979); *Jones v. N.C. Prisoners' Union*, 433 U.S. 119 (1977); *Pell v. Procunier*, 417 U.S. 817 (1974).

Court in *Thornburgh v. Abbott*, 490 U.S. 401 (1989), determined that prison restrictions on publications or materials sent into the prison from the outside "must be analyzed under the *Turner* reasonableness standard." *Id.* at 413. The *Abbott* Court, however, did not entirely abandon the analysis set forth in *Martinez*. Rather, the *Abbott* Court noted "that the logic of our analyses in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning *outgoing* correspondence," *id.* at 413 (emphasis supplied), and that there is no reason to treat incoming correspondence from non-prisoners differently than incoming correspondence from prisoners, *id.* at 413-414, where the material in question is "targeted to a general audience," can be "expected to circulate among prisoners," and is of a kind that is likely to lead to "disruptive conduct," *id.* at 412.

Here, as in *Turner*, the regulation (i.e., the Policy) potentially affects the rights of prisoners and non-prisoners, at least where the non-prisoner wants contact. Additionally, as in *Martinez*, the regulation affects both incoming and outgoing correspondence. Moreover, unlike in *Abbott*, the incoming communication is not addressed to a general audience. The impact of *Martinez* on this case is thus uncertain. Consistent with the Supreme Court's approach in *Turner*, in which the Supreme Court applied its reasonableness standard to a marriage regulation that impacted the rights of prisoners and non-prisoners alike, without resolving whether *Martinez* called for greater scrutiny, 482 U.S. at 97, the Court begins by assessing the Policy under the *Turner* reasonableness standard.

   *1.* **Turner** *analysis*

Under the reasonableness standard, the issue is whether the Policy is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. That question is subject to a multi-factor analysis. *Id.*

### a. Rational connection to a legitimate interest

For a regulation to be reasonable in the prison setting, "there must be a 'valid rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. U.S. 576, 586 (1984)). Additionally, restrictions on association and speech should be neutral with respect to content. *Id.* at 90.

In *Turner*, the Supreme Court held that a bar on correspondence between prisoners held in different facilities was rationally connected to a legitimate prison security interest. *Id.* at 93. The fact that the regulation was content neutral was important to the Court's determination. *Id.* In *Abbott*, the Court considered the constitutionality of a policy that authorized the warden to ban prisoners from receiving certain publications "determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." 490 U.S. at 404. Although the regulation was content-specific, the Court found that it was "'neutral' in the technical sense" because it was to be applied based on the potential that a particular publication would have a negative impact on a valid security interest. *Id.* at 416.

Defendant argues that the Policy has a rational connection to the legitimate objective of prisoner rehabilitation. According to Defendant, the policy is designed to foster "pro-social change" through rehabilitative programming. (Def.'s Motion at 5, 7.) In Defendant's words: "What the policy is aimed at stopping in the short term and preventing in the long term is the abusive behavior that domestic violence offenders use to exert power and control over their victims, often through communication." (*Id.* at 7.) Conversely, Plaintiff contends that the Court should not give deference to Defendant's stated rationale because the Policy exists only "to

15

implement broad social policy unrelated to the safe and orderly operation of a prison" (Pl.'s Motion at 18) and neither rehabilitates prisoners nor enhances prison security (*id.* at 19, 22).

A review of the record reveals disputed facts that are material to the assessment of whether the Policy has a rational connection to the rehabilitation of those who have perpetrated or are at risk for perpetrating domestic violence. For instance, the record lacks uncontroverted evidence that the Policy, which purports to prohibit contact regardless of the content of any communication, in fact contributes to the rehabilitation of a prisoner such as Mr. Hart, who has allegedly perpetrated domestic violence, but is not incarcerated as the result of a domestic violence conviction. Indeed, the parties have offered competing evidence as to the connection between the Policy and the stated objective.[22] At a minimum, a fact finder must evaluate the conflicting evidence and determine whether the Policy in fact serves to rehabilitate.[23]

    b.  *Alternative means of expression*

The second factor that courts must consider is the availability of "alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. In this context, the "right" is to be "viewed sensibly and expansively." *Abbott*, 490 U.S. at 418. When the Policy is applied, a prisoner and a non-prisoner would have no contact. The right, therefore, would not be exercised. Whether an alternative means of communication remained open to Plaintiff and Mr. Hart requires resolution of the factual issues relevant to the relationship between the Policy and the rehabilitation objective. Additionally, if no contact in fact furthered rehabilitation, the lack of

---

[22] As explained above, Plaintiff has presented the opinions of Julia Colpitts, and Defendant has offered the opinions of Commissioner Ponte and Ms. Mosher.

[23] The Court's reference to the factual dispute regarding the Policy's relationship to rehabilitation is not intended to suggest that it is the sole factual dispute of record.

16

an alternative means of expression might be less of a concern. The Court, therefore, cannot appropriately assess this factor without resolution of the disputed facts.

      *c.*  *Impact of accommodation on guards and other inmates*

  The third factor that courts must examine is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. The law recognizes that prisons have "limited resources for preserving institutional order" and that courts should be "particularly deferential to the informed discretion of corrections officials" when it is apparent that accommodation "will have a significant 'ripple effect' on fellow inmates or on prison staff." *Id.* The parties have presented conflicting assessments regarding the burden that would result for guards and other employees if the Policy allowed for some limited contact.

  Defendant expresses concern over the possibility of "spill over" from "anti-social behavior." (Def.'s Motion at 8.) Defendant also suggests that a communication ban imposed pursuant to the Policy prevents manipulation of non-prisoners to engage in conduct harmful to prison security. (*Id.*) Plaintiff maintains that the Policy actually increases burdens on prison personnel and that the burden on prison personnel would be minimal if the prison managed Plaintiff's contact with Mr. Hart as it managed the other relationships between prisoners and non-prisoners.

  Once again, the significance of the burden depends in part on the resolution of the factual issues that are relevant to the relationship between the Policy and the stated rehabilitation objective. That is, if the evidence establishes that the desired rehabilitation can be achieved without an absolute prohibition on contact, the Court would have to assess the potential burden in the context of the contact that was contemplated.

### d. *Absence of ready alternatives*

The fourth factor asks whether the regulation's objectives can be obtained through ready alternatives that do not infringe upon constitutional rights. *Turner*, 482 U.S. at 90. If "obvious, easy alternatives" to the Policy exist, that "may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* Whether a realistic alternative can achieve the rehabilitation that the Policy is allegedly designed to achieve is similarly dependent on the resolution of the factual issues regarding the relationship between the Policy and rehabilitation.

### 2. **Martinez** *analysis*

In *Martinez*, the Supreme Court determined that for a regulation of a prisoner's outgoing mail to be constitutional, "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression" [and] "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." 416 U.S. at 413. Assuming that the reasoning in *Martinez* is applicable under the facts of this case, even if the Court applied the *Martinez* standard, the same factual issues would remain in dispute. That is, a fact finder would still have to determine whether the regulation actually furthers the rehabilitation of perpetrators of domestic violence (similar to *Turner* factor one) and whether the regulation, as applied to Plaintiff, limited her rights no more than necessary to achieve the Department's rehabilitative purpose (similar to *Turner* factor 4). The Court's analysis and conclusion at this stage of the proceedings, therefore, would not be materially different regardless of the applicable standard.

**CONCLUSION**

As explained above, because the record contains factual issues in dispute, neither party is entitled to summary judgment. The Court, therefore, denies Plaintiff's Motion for Summary Judgment (ECF No. 34) and Defendant's Motion for Summary Judgment (ECF No. 44.).

The Court nevertheless questions whether the case presents a matter for trial given (1) that Defendant has cited alternative grounds (i.e., security concerns based on purported drug activity) for denying contact between Plaintiff and Mr. Hart, and (2) that Mr. Hart might no longer be in custody.[24] Accordingly, the Court will schedule a conference with the parties to discuss the future course of the case.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 20th day of February, 2015.

---

[24] The record reflects that Mr. Hart was sentenced to a term of 18 months on August 1, 2013. (ECF No. 47-1, PageID # 717.) Absent the imposition of any additional terms of incarceration, Mr. Hart would have completed his sentence by this date.